IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs December 3, 2018

## IN RE  MICKEAL Z. ET AL.

**Appeal from the Juvenile Court for Claiborne County**
**No. 2016-JV-1884   Robert M. Estep, Judge**

_____

### No. E2018-01069-COA-R3-PT

_____

This is a termination of parental rights case.  The trial court found that the proof supported three grounds for termination as to both parents: substantial noncompliance with the permanency plan requirements pursuant to Tennessee Code Annotated section 36-1-113(g)(2), persistence of conditions pursuant to Tennessee Code Annotated section 36-1-113(g)(3), and failure to manifest an ability to parent pursuant to Tennessee Code Annotated section 36-1-113(g)(14).  The court further found that the termination of both parents' parental rights was in the children's best interests.  Having reviewed the record on appeal, we affirm the trial court's finding that the proof supported the substantial noncompliance ground as to Mother, reverse its finding that the proof supported the substantial noncompliance ground as to Father, vacate the other grounds for termination against both Mother and Father based upon insufficient findings by the trial court, affirm the trial court's finding that termination of Mother's parental rights is in the children's best interests, and remand the case for further proceedings consistent with our direction in this Opinion.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed in Part, Reversed in Part, Vacated in Part and Remanded**

ARNOLD B. GOLDIN, J., delivered the opinion of the Court, in which ANDY D. BENNETT and THOMAS R. FRIERSON, II, JJ., joined.

Jordan Long, Knoxville, Tennessee, for the appellant, Alesha Z.

Dennis M. Bailey, Jr., Tazewell, Tennessee, for the appellant, Ed P.

Herbert H. Slattery, III, Attorney General and Reporter; Amber L. Seymour Assistant Attorney General, for the appellee, Tennessee Department of Children's Services.

**OPINION**

**BACKGROUND AND PROCEDURAL HISTORY**

Alesha Z. ("Mother") is the mother of the following three children who are the subject of this appeal: Mickeal Z. (born 2007), Mahaley P. (born 2011), and Morgan P. (born 2015).[1] Ed P. ("Father") is the biological father of two of these children, Mahaley P. and Morgan P.

The Tennessee Department of Children's Services ("the Department") became involved with the parents and children in October 2016 after Mother was found with the children on the side of the road in Claiborne County. According to a later-filed "Petition for Temporary Legal Custody," the allegations of which were stipulated to by the parents, the Department's involvement itself stemmed from allegations that there was a drug-exposed child. In pertinent part, the Department's petition for custody outlined the following:

> 2. This matter came to the Department's attention upon a referral for Drug Exposed Child. CM Gilliam made contact with the mother, Alesha, who stated that she had broken down after picking up her children from school in Ed's truck. The family has been living part of the time in Clairfield, TN and the rest of the time in Middlesboro, KY. Alesha stated that she did not have anyone to help her and so she reached out to the police. The truck was impounded and Alesha and the kids were brought to the Justice Center. There was no insurance on the truck and Alesha did not have her driver's license with her. Alesha did not have a booster seat in the truck for Mahaley. Alesha and the children were in the broken down vehicle for approximately 6 hours.

> 3. Alesha stated that she had "messed up" and done meth. Alesha stated that she had also taken a Hydro 7.5 earlier that day that she had found from an old prescription. Alesha consented to a [urine drug screen] and failed for methamphetamine, amphetamine, and THC. Alesha stated that she did not have anyone to pick her up and help her and that she and her fiancé Ed had split up because he had kicked her in the face. Alesha reported that Ed had kicked her in his sleep when she tried to wake him.

> 4. Alesha stated that her children had been staying with her father . . . at night in Middlesboro, KY by agreement but that she had kept the children

---

[1] This Court has a policy of protecting children's identities in parental termination cases by initializing the last names of the parties.

with her since the weekend. Alesha stated that she had broken down in her car the night before and had not got the children home until 4:00 am.

5. Alesha stated that the home at 108 Brentwood Circle Middlesboro, KY was built in 1893, and that it did not have water or electricity. Alesha stated that she and Ed were trying to remodel the home.

6. Ed could not be reached and Alesha stated that he was out of minutes and could not text either. Alesha requested for her father . . . to go get Ed and bring him to the Justice Center. [Her father] refused and stated that he does not get along with Ed. Alesha named several family members in TN but none could be approved for an IPA.

7. The children appeared tired and dirty. The baby Morgan was coughing and fussy. The baby smelled like vomit and the officer reported that the baby had vomited earlier. Mahaley appeared dirty and her clothes were dirty. Mickeal appeared appropriate but was very upset that he was going to have to miss his field trip at school on Wednesday.

On October 13, 2016, the Claiborne County Juvenile Court entered a protective custody order, pursuant to which the Department was awarded temporary legal custody of the children. A preliminary hearing was set for October 19, 2016, and following that hearing, the juvenile court determined that probable cause had been established to show that the children were dependent and neglected. An "Adjudicatory Hearing Order" was entered the following month after both parents waived the scheduled adjudicatory hearing and stipulated to the allegations in the Department's petition for custody. Pursuant to this latest order, the juvenile court held that the children were "dependent and neglected within the meaning of the law" and that their removal was required pursuant to the Tennessee Code. Although the order provided that the Department would retain temporary custody of the children, it also stated that the parents would be allowed supervised visitation according to the rules and regulations of the Department.

During the course of the Department's involvement with the family, a number of permanency plans were created. The first permanency plan, dated October 26, 2016, had several requirements directed to ensuring that the children had stable housing and that the parents were drug-free. With respect to the parents' ability to provide safe and stable housing, for instance, the permanency plan directed the parents to give the Department documentation of valid housing, provide information regarding their address, and provide documentation of legal income. Regarding substance abuse concerns, the permanency plan required Mother to schedule and attend an alcohol and drug assessment and follow all recommendations. Moreover, both parents were required to pass random drug screens and pill counts.

- 3 -

In addition to the above, the permanency plan had several other discrete requirements. Included among these was the requirement that Father establish parentage of the children. Further, the parents were required to attend the children's medical appointments, as well as create a transportation plan and provide the Department with proof of insurance on any vehicle in which the children would be transported. Concerning the parents' responsibilities regarding visitation, the permanency plan provided in relevant part as follows:

> Parents will schedule visitation at least one week prior to the desired visitation with the department FSW or private provider (if utilized). Parents will cancel any visit at least 24 hours prior to the scheduled visitation. Parents will arrive at the visit at least 15 minutes prior to the scheduled visit. The visitation will be cancelled if the parents arrive 15 minutes (or more) late for the visit. Parents will provide their own transportation to and from scheduled visit. Parents will provide for all the needs of the child(ren) during the visit such as any needed snacks, drinks, and diapers. Parents will demonstrate appropriate parenting skills during visits. Parents will not be under the influence of drugs or alcohol before or during the scheduled visit.

The second permanency plan, dated April 11, 2017,[2] added additional requirements for the parents. Whereas Father was required to schedule a mental health assessment, both parents were required to begin family counseling. Both parents were also required to take anger management classes and provide documentation to the Department that the classes were completed. Further, the parents were directed to maintain contact with the Department at least once a week.

Citing concerns that Mother's diabetes was impeding her ability to effectively care for the children, the second permanency plan also required Mother to "follow recommendations from her doctor to maintain her health." Moreover, in light of the fact that both parents had criminal trespassing charges and unpaid tickets, both parents were required to resolve all legal issues.

The third permanency plan, dated October 11, 2017, was generally consistent with the previous two plans. However, as the Department has highlighted, the third plan specifically noted that Mother was not following the recommendations of her alcohol and drug assessment, whereas it did acknowledge that both parents had provided copies of valid driver's licenses.

On June 12, 2017, the Department filed its "Petition to Terminate Parental Rights" in the Claiborne County Juvenile Court, requesting that Mother's parental rights be

---

[2] This second permanency plan was ratified on May 17, 2017.

terminated as to Mickeal Z., Mahaley P., and Morgan P., and that Father's parental rights be terminated as to Morgan P. The petition was later amended to specify that the Department was also seeking to terminate Father's parental rights to Mahaley P. Multiple grounds for termination were alleged in the Department's petition. As to both parents, the following grounds were asserted: abandonment for failure to provide a suitable home, substantial noncompliance with permanency plan, persistent conditions, and failure to manifest an ability to parent. As to Father alone, the Department alleged that Father had engaged in conduct that exhibited a wanton disregard for the children's welfare. In addition to asserting the above grounds for termination, the Department averred that the termination of Mother's and Father's parental rights would be in the children's best interests.

On May 11, 2018, the juvenile court held a hearing on the Department's termination petition. The first witness to testify was Nicki Stone, a case manager with the Department. Ms. Stone testified that when the family was brought to the attention of the Department, Mother reported to her that "things had been rough for her and that she had really messed up, that she had used meth and that she had taken some sort of pain pill." According to Ms. Stone, Mother also reported that the home she and Father were residing in at that time had no water or electricity. Regarding the children, Ms. Stone stated that the children appeared "very tired and dirty" when she first saw them. Although Ms. Stone stated that Father could not be reached the night that the children came into custody, she testified that, during her subsequent interaction with him, he was compliant with everything that she asked him to do.

Next to testify was Jessica Dillon, a family service worker with the Department. Ms. Dillon was involved in the case from the time the children came into custody until the end of January 2017. She testified that she met with the parents to create the initial permanency plan. Among her concerns was the parents' housing; according to Ms. Dillon, their previous housing was not livable "due to bedbugs and several different things going on in that home." Mother's drug issues were also among Ms. Dillon's biggest concerns with the family at the time the initial permanency plan was created. During a drug screen on December 9, 2016, Mother tested positive for amphetamine, methamphetamine, opiate, and Oxycodone. Ms. Dillon testified, however, that Father tested clean at that time.

After Mother failed to show up on time for a January 13, 2017 visit, Ms. Dillon tried to find her and eventually located her in a mall bathroom. Ms. Dillon testified that, although she tried to administer a drug screen to Mother on that date, Mother refused. A few days later, on January 17, 2017, Ms. Dillon made an unannounced visit to a residence the parents had obtained at a trailer park in Cumberland Gap. No one was present when she arrived, and Ms. Dillon observed that there was a large amount of debris around the home, that there were smashed windows, and that the home did not appear to be livable.

- 5 -

According to Ms. Dillon, at a subsequent foster care review board meeting on January 19, 2017, Mother tested positive for amphetamine, methamphetamine, and THC.

Ms. Dillon testified that Mother showed up for about half of her visitations with the children. Although she testified that the visits went well overall, she also stated that on some visits she suspected that Mother was under the influence. Ms. Dillon stated that Father was present at all of his visitations from what she recalls and that he did not fail any drug screens while she had the case.

After Ms. Dillon testified, the court heard from Rhonda Combs, an employee with Youth Villages. Ms. Combs was assigned to work with the family beginning in December 2016 after a referral from the Department, and she carried this responsibility through April 2017. Ms. Combs testified that her role was as a support to help the parents meet the conditions of the permanency plan and that she was available three days a week. However, her testimony revealed that there was a lack of consistency regarding the parents' usage of this resource:

> Three times a week is what our schedule was. There were times that we would have a high rate of no-shows, and then they would do great and meet consistently for the next three weeks. And then they might fall off the next week, and it'd be once a week, then twice a week. So it kind of went back and forth a little bit.

Regarding the parents' trailer in Cumberland Gap, Ms. Combs testified that it had weak flooring and that it did not initially have water or electricity. Although she stated that the parties had made some progress by the time her involvement ended, she testified that the progress made was "minimal" and that there were still electrical issues in that wiring was exposed and not behind drywall. Ms. Combs further stated that, although a kitchen sink was working when she left, the parties had to use public facilities or five-gallon buckets they kept in the trailer in order to use the restroom. Although Ms. Combs advised the parents about public housing, she testified that no documentation was ever provided to her to confirm a claim made by Mother that the family was on a waiting list.

According to Ms. Combs, although the parents had put up some drywall in the trailer "for a little bit," the progress was removed. As she explained it:

> The problem . . . was whenever there would be an argument or disagreement in the home, [Mother] told me that -- and I saw the damage but she told me she did, but she took a hammer and went all the way down every bit of that drywall and busted it back up.

Ms. Combs further testified that graffiti had sometimes appeared in the home, the product of Mother venting her frustration following a disagreement. We observe that pictures

chronicling some of the graffiti was introduced as an exhibit at trial. One of the messages, written in large print across a wall, concludes in part with the following: "What are you f***** in the head! You[']ll Regret." Another picture of Mother's graffiti shows a message stating that, "I Bought it  I Bought it  I hung it sorry for your luck  That's what you get for refusing to take me to Rehab  F*** You." Clearly evident and interspersed throughout the graffiti in this latter message are various holes in the wall. According to Ms. Combs, Mother never reported that Father had made any of these holes and actually self-professed that the destruction was her own doing.

Specifically regarding the relationship between the parents, Ms. Combs testified as follows:

> When I first started with the case . . . [Father] . . . was actually in the hospital at U.T. after his surgery. [Mother] was extremely concerned with his care and well-being, wanted to take care of him, make sure he got better. So, initially the relationship seemed healthy, and they were there for each other.
>
> As we went on, whether it was high frustration levels or whatever contributed to it, there were many times that [Mother] would talk at me and tell me that he'd left her on the side of the road, that they had gotten in a fight going down the road -- she never said physical, just a fight going down the road. And he'd left her on the side of the road multiple times, that he'd dropped her off in front of the emergency station down from their house once before.
>
> There were frequent instances that they would be arguing, and he would leave the home to try to -- my sense would be to try to calm down before he came back. And she would follow him, and the situation would escalate again.

Although Ms. Combs recommended couple's counseling on multiple occasions to the parents, she claims there was "never any follow-through on that."

Ms. Combs also testified at length about Mother's drug issues. She claimed that Mother reported using marijuana frequently and that she had observed marijuana paraphernalia upon one visit to the parents' home. Moreover, Ms. Combs stated that Mother had reported to stealing Father's pain medication at one point and that she had admitted to going on meth binges:

> She would tell me she would be clean, and she would be very proud of herself when she hadn't used anything for several days at a time. And I was proud of her, too, when she wasn't using. And then she would tell me,

you know, that I'm going to be upset with her, that I'm going to be disappointed with her because she had used. And it was typically a time when she would be out of communication for two or three days, wouldn't respond when I tried to get in touch with her, and then she'd get in touch with me and tell me that's what had happened.

According to Ms. Combs, Mother was recommended to have in-patient treatment, and Ms. Combs even accompanied Mother throughout the entire intake process at a rehabilitation center. However, Ms. Combs testified that, after she left Mother at the center, Mother checked herself out within hours.

Father began his trial testimony by confirming that, although he was the father for Mahaley P. and Morgan P., he was not the biological father of Mickeal Z. He also stated that his residence at the time of the children's removal was at "Brentwood Circle." At the time of trial, he claimed to be living in a trailer owned by Mother and located approximately 150 feet from Mother's own home.

Father admitted that he oftentimes gets frustrated with Mother, and when asked how certain parts of the previous home in Cumberland Gap had been destroyed, he stated as follows:

[A:] We had an argument and I would leave, and she would write on the wall or knock a hole in the wall one way or another.

[Q:] And you would come back to her?

[A:] I would come back because she's the mother of my children. I love her, yes, I do. But I'm not going to sit there and be treated or talked to bad because I can't get out what I need to.

Father also confirmed that he had broken his cell phone following a recent argument with Mother, but despite the occurrence of conflicts such as these, he admitted that he had never engaged in family counseling with Mother. Although much of Father's testimony communicated the idea that he and Mother were "not together as a couple,"[3] the two were still involved with one another at the time of trial, even if such involvement was not of a romantic nature. Aside from the fact that the two lived next door to one another, Father testified that because Mother did not have a driver's license he would sometimes drive

---

[3] This notion seems to be the primary one communicated by Father, although we do note that the following exchange is present in the transcript of Father's testimony: "[Q:] But you stayed together for a really long time, and you all are still together. [A:] Yes, we have tried to work things out. Yes, we have."

her and serve as her transportation. For instance, he stated that he drove Mother to court on the date of trial.

During the course of his testimony, Father recalled two occasions on which he had dropped off Mother at the police station following an argument. In explaining this, he stated as follows:

> She'd gone off on me. I asked her to get out of my vehicle. She refused to get out of my vehicle. I'm not going to sit and be yelled at and stuff and me not able to talk and defend myself. So I stopped at the police station and had a police officer get her out of the car so I wouldn't have to physically remove her from my vehicle.

When asked how he would avoid Mother if he was to ever regain custody of his children, Father replied as follows: "If need be, I would find suitable -- other suitable housing to where DCS could come in and approve it before I ever moved. Whatever it takes to get my kids home and make sure they're safe with me I will do." He also stated later in his testimony that "if there is a Court Order that [Mother] is not [to] be around the kids, I would ask for a petition . . . stating from the Court that she is not to be around me or the kids." Father indicated that he would have no problem calling law enforcement to ensure compliance with any such order.

Mother testified following Father. She admitted to having a meth problem at the time the children came into custody and did not dispute that she had failed several drug screens. She also admitted to having put graffiti on the walls of the Cumberland Gap home and to having taken a hammer and "bust[ing] out a piece of drywall" there. When asked if she had ever had the in-patient treatment recommended by her drug assessment, Mother stated that she had not. She further admitted that, despite initially checking into one in-patient rehab, she had not stayed long. Mother claimed to be clean at trial and testified that she had been clean for some time, even asserting that she had been clean during a period when she got a DUI. Moreover, even though a drug screen from November 2017 indicated that Mother tested positive for opiates, Mother testified that she believed this result was incorrect.

Although Mother acknowledged living next to Father, she stated that she did not have a key to his home. When asked what she would do if Father got custody back, Mother stated that she would move further away from Father; she also acknowledged that she was willing to follow any type of court orders. Additionally, Mother testified that Father had never approved of any drug use.

Rachel Raines, a foster care worker for the Department, testified after Mother. According to Ms. Raines, who had worked with the family since January 2017, she could not recall Mother ever passing a drug screen prior to the filing of the termination petition.

Ms. Raines offered to take Mother to rehabilitation for treatment, and ultimately did so, as she described at trial:

> Well, first, I had to come and get to her home. We had to kind of convince her to ride with me. She was very agitated. We rode down, and she was upset. We talked about her drug addiction and how long it had been going on and the kids and how important this was to start on her recommendations.
>
> And we got to the rehabilitation. They explained how rehabilitation would go. Ms. Combs later on joined us. We stayed with her through the entire process of them going through her things. And when she decided she would stay and go to bed, they asked me to leave and I did so.

Despite Mother's initial entry into treatment, Ms. Raines stated that Mother ultimately only stayed "[t]welve hours or less." Ms. Raines testified that she had attempted to help Mother find some type of rehab at other times and provided Mother with contact information of other long-term facilities.

According to Ms. Raines, she had been concerned that Mother might harm herself on several occasions. Recounting one such incident, Ms. Raines testified as follows:

> There was one occasion she failed a drug screen. She felt that she didn't fail. I called Mobile Crisis, because she said she was going to get a gun and . . . kill herself. Mobile Crisis told me if I was that concerned, I needed to call the police, but she was very upset and, like, walking away from me. This is in the middle of the mall. I followed her outside, and she just kept walking away from me.

In addition to specifically addressing Mother's substance abuse issues and past concerns that Mother might self-harm, Ms. Raines also generally testified as to the parties' compliance with the various requirements of the permanency plans that were created in the case. In the course of doing so, she indicated that the parents' respective residences were now "environmentally" appropriate. She also offered testimony, however, expressing her belief that the children would be better off in their current foster care placement.

The last witness to testify was the children's foster mother, Diane T. ("Foster Mother"). Foster Mother testified that she had been a foster parent for the children since October 2016 and that she felt like she had a bond with the children. She expressed her intention to adopt the children should they be made available for adoption.

- 10 -

Foster Mother agreed the children loved Mother and appeared to have a bond with her, and regarding Father, Foster Mother testified that there was "absolutely" a bond between him and his children and that he was always "very attentive to his children" during visitations. She also stated that the children "feel that they have two moms and two dads."

Following the conclusion of the termination hearing, on June 1, 2018, the juvenile court entered an order that terminated both Mother's and Father's parental rights. Although the court dismissed the ground of abandonment for failure to provide a suitable home and also the ground of wanton disregard that was directed against Father, it found that the remaining grounds for termination had been established and that termination of the parents' parental rights was in the children's best interest. This appeal followed.

## STANDARD OF REVIEW

"A biological parent's right to the care and custody of his or her child is among the oldest of the judicially recognized liberty interests protected by the due process clauses of the federal and state constitutions." *In re M.L.P.*, 228 S.W.3d 139, 142 (Tenn. Ct. App. 2007) (citations omitted). "Although this right is fundamental and superior to claims of other persons and the government, it is not absolute." *In re J.C.D.*, 254 S.W.3d 432, 437 (Tenn. Ct. App. 2007) (citation omitted). "It continues without interruption only as long as a parent has not relinquished it, abandoned it, or engaged in conduct requiring its limitation or termination." *In re M.J.B.*, 140 S.W.3d 643, 653 (Tenn. Ct. App. 2004) (citations omitted). In Tennessee, "[w]ell-defined circumstances exist under which a parent's rights may be terminated." *In re Roger T.*, No. W2014-02184-COA-R3-PT, 2015 WL 1897696, at *6 (Tenn. Ct. App. Apr. 27, 2015), *no perm. app. filed*. Pursuant to the Tennessee Code, parties who have standing to seek the termination of a parent's parental rights must prove two things. They must first prove at least one of the statutory grounds for termination. *In re J.C.D.*, 254 S.W.3d at 438 (citing Tenn. Code Ann. § 36-1-113(c)(1)). Then, they must prove that termination of parental rights is in the child's best interests. *Id.* (citing Tenn. Code Ann. § 36-1-113(c)(2)).

Because the decision to terminate a parent's parental rights has "profound consequences," trial courts must apply a higher standard of proof in deciding termination cases. *In re M.L.P.*, 228 S.W.3d at 143. "To terminate parental rights, a court must determine that clear and convincing evidence proves not only that statutory grounds exist but also that termination is in the child's best interest." *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002) (citing Tenn. Code Ann. § 36-1-113(c)). "Clear and convincing evidence is evidence that eliminates any substantial doubt and that produces in the fact-finder's mind a firm conviction as to the truth." *In re M.A.B.*, No. W2007-00453-COA-R3-PT, 2007 WL 2353158, at *2 (Tenn. Ct. App. Aug. 20, 2007) (citation omitted). This heightened burden of proof "minimizes the risk of erroneous decisions." *In re M.L.P.*, 228 S.W.3d at 143 (citations omitted).

Due to the heightened burden of proof required under the statute, we must adapt our customary standard of review. *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005). "First, we must review the trial court's specific findings of fact de novo in accordance with Tenn. R. App. P. 13(d)." *In re M.J.B.*, 140 S.W.3d at 654. "Second, we must determine whether the facts, either as found by the trial court or as supported by the preponderance of the evidence, clearly and convincingly establish the elements required to terminate a biological parent's parental rights." *Id.* (citations omitted).

## DISCUSSION

Both Mother and Father have raised issues for our consideration in this appeal. Each parent challenges the grounds for termination found by the trial court and the court's determination that termination of their parental rights is in the best interest of the children. Of course, our review on appeal would ordinarily reach these matters regardless of whether the parents had specifically raised them. In order to help "ensure that fundamental parental rights are not terminated except upon sufficient proof, proper findings, and fundamentally fair procedures," we are required to review the trial court's findings as to each ground for termination and as to whether termination is in the child's best interest. *See In re Carrington H.*, 483 S.W.3d 507, 525-26 (Tenn. 2016) ("[I]n an appeal from an order terminating parental rights the Court of Appeals must review the trial court's findings as to each ground for termination and as to whether termination is in the child's best interests, regardless of whether the parent challenges these findings on appeal.").

*Substantial Noncompliance with the Permanency Plan Requirements*

Pursuant to Tennessee Code Annotated section 36-1-113(g)(2), a court may terminate a parent's parental rights when the parent is in "substantial noncompliance . . . with the statement of responsibilities in a permanency plan." Tenn. Code Ann. § 36-1-113(g)(2). In conjunction with terminating a parent's parental rights under this ground, the court "must first find that the plan requirements are reasonable and related to conditions that necessitate foster care placement." *In re Hannah H.*, No. E2013-01211-COA-R3-PT, 2014 WL 2587397, at *10 (Tenn. Ct. App. June 10, 2014) (citations omitted). "The trial court must then find that the noncompliance is substantial." *Id.* (citation omitted). Although the termination statute does not define what conduct constitutes substantial noncompliance, terminating parental rights under this ground "requires more proof than that a parent has not complied with every jot and tittle of the permanency plan." *In re M.J.B.*, 140 S.W.3d at 656. The significance of the noncompliance "should be measured by both the degree of noncompliance and the weight assigned to that requirement." *In re Valentine*, 79 S.W.3d at 548. "Terms which are not reasonable and related are irrelevant, and substantial noncompliance with such terms is irrelevant." *Id.* at 548-49. Because determining whether substantial noncompliance

exists is a question of law, we review the issue de novo with no presumption of correctness. *Id.* at 548.

At the outset, we note that we are of the opinion that the requirements in the parties' permanency plans were reasonable. The children came into the Department's custody amidst a backdrop of substance abuse concerns relating to Mother and concerns regarding both parents' housing situations, and the permanency plans wisely had a number of requirements devoted to remedying these concerns. With respect to Mother's drug problems, for example, Mother was required to schedule and attend an alcohol and drug assessment, follow all recommendations from that assessment, submit to and pass random drug screens, and pass random pill counts. The parents were also responsible for acquiring safe and stable housing and were directed to notify the Department of their address and give documentation of any valid housing obtained. Other requirements were placed on the parents through the permanency plans, of course, but these two big issues— achieving sobriety for Mother and establishing safe housing for both parents—remained at the forefront of the Department's focus, which was evidenced by the testimony at trial.

In this case, the trial court cited a few considerations it believed justified a finding of substantial noncompliance with regard to Mother. The first concerned Mother's failure to comply with the permanency plan requirements regarding her drug issues. We agree that Mother's lack of compliance with respect to her sobriety rises to a level of substantial noncompliance on its own, but before specifically addressing that concern, we turn to a few other issues that the trial court found relevant for purposes of establishing substantial noncompliance with respect to both parents.

Outside of taking issue with Mother's lack of progress regarding her substance abuse concerns, the trial court referred to the parties' supposed noncompliance with required anger management and also alluded to some apparent deficiency with regard to the parents' participation in parenting classes. Specifically, the trial court's order stated as follows:

> [The second] Family Permanency Plan added the requirement for the parents to take anger management classes and provide documentation of completion. [Father] testified that he has completed his anger management class. However a certificate of completion is not found in the file. He testified that he had gone for four (4) months and that it was supposed to be seven (7) classes of two (2) hours each at the Appalachian Life Center. He stated that he had "learned to walk away from situations that had made him angry" and "learned to not let stuff get to him". He further stated that he had been to parenting classes and Al-Anon meetings.
>
> The Court is very concerned about the anger management of both parents and the communication skills of both parents. The removal of the

- 13 -

children in October 2016 was precipitated by the anger and lack of communication of the parents. [Mother] had the children on the side of a road in a remote area of Claiborne County, TN for approximately six (6) hours in a broken down vehicle without any communication. The mother and children were found by law enforcement and taken to the Claiborne County Justice Center. The mother tested positive for drugs. The evidence presented at the time of the removal and at the hearing for termination of parental rights is clear that the parents were arguing to the point that it caused the children and the mother to be placed in a dangerous situation. It was not acceptable for [Father] to simply allow [Mother] to leave from the home with the children because he had anger issues and did not approve of her drug use. He had a responsibility to care for the children and to make sure they had a good and safe home in which to reside, despite his feelings toward [Mother] and her issues. The resolution of the conflict between [Father] and [Mother] is absolutely mandatory before there can be a reunification with the children. It appears that progress has been made, however the action step required by the Family Permanency Plan by the desired outcome date had obviously not been met. Therefore the Court finds by clear and convincing evidence that the State of Tennessee, Department of Children's Services has proven substantial noncompliance with the Family Permanency Plan by both parents in failing to prove compliance with the action step requiring anger management and parenting classes.

A few preliminary observations are in order with regard to the above analysis. First, it is worth noting that the trial court's concern with the parents' alleged failure to comply with anger management and parenting classes is presented as independently justifying a finding of substantial noncompliance. We would further note that inasmuch as these issues and Mother's drug issues are the only ones referenced as areas of noncompliance by the trial court in the entirety of its analysis as to this ground, other areas of noncompliance established by the record were evidently not ascribed any significant weight. *See In re Valentine*, 79 S.W.3d at 548 ("Presumably, the trial court did not consider Ms. Wallace's failure to strictly comply with the counseling requirement to be significant, given the lack of any finding of fact concerning this requirement.").[4]

---

[4] Additionally, we note that although the Department argues on appeal that one of the biggest objects of the permanency plans—safe and stable housing—was not achieved until after the termination petition was filed, the trial court was clearly of the opinion that the parents' efforts at stable housing were not unduly belated in the context of this ground for termination. In its order, the trial court stated as follows: "[T]he requirement to provide safe and stable housing has been met." Because the Department did not raise any issue on appeal specifically challenging the trial court's finding that this requirement of the permanency plans had been sufficiently satisfied, we deem any such potential issue to be waived. *See Forbess v. Forbess*, 370 S.W.3d 347, 356 (Tenn. Ct. App. 2011) ("We may consider an issued waived where it is . . . not designated as an issue.").

Turning to the specific merits of the trial court's findings regarding the "parents['] . . . fail[ure] to prove compliance with the action step requiring anger management and parenting classes," we note that there is ample evidence in the record that these classes were attended. Although it is true that (a) the permanency plan requirement regarding anger management required, among other things, documentation of attendance and (b) the trial court remarked that no "certificate of completion" was found in the record for Father, multiple witnesses testified that these classes were completed, including a witness from the Department. Father testified that he had completed anger management, and when Mother was asked if Father had completed parenting classes, she responded: "Yes, and he was never asked to do so." For her part, Mother testified that she had also finished anger management and parenting classes. The parents' respective accounts were not refuted by the Department. When Ms. Raines testified at trial, she indicated that anger management had been completed "months and months ago," and she testified that both parents had completed parenting classes. Therefore, to the extent the trial court's finding of substantial noncompliance was predicated on a lack of completion of anger management and/or parenting classes, its finding is not in accord with the evidence.

There is no question that the trial court appeared to place some emphasis on the fact that it found general conflict to still exist between the parents, and to be fair, this is not an irrelevant consideration under the permanency plan as drafted, which requires the parents to "demonstrate the knowledge and skills [they have] learned" from anger management classes. However, while there may be evidence that not all conflict had been resolved within the timeframe expected under the permanency plans, the proof clearly shows that anger management and parenting classes were completed by both parents, as noted above. Again, to the extent that the trial court's analysis appears to suggest otherwise, it is in conflict with the clear weight of the evidence.

The picture we are left with, then, is one that shows that some conflict still existed, although the parents had completed the anger management classes required of them. This is the only area of noncompliance cited by the trial court against Father, and we conclude it does not justify a finding of substantial noncompliance considering its overall weight and the degree of the parents' noncompliance and considering the importance of other requirements with which the trial court took no issue.[5] Again, while it is true that part of the anger management requirements under the plan directed Father and Mother to *demonstrate* their skills, the trial court even found that some progress had been made, and contrary to the suggestion that appears in its order, testimony from the parents and the Department's employee shows that the parents completed their classes. In light of all this

---

[5] We would further note that, in an affidavit from April 2018, Ms. Raines attested that Father had completed his plan. Although Ms. Raines testified at trial that she had been "mistaken in that affidavit" due to overlooking "some of the things [Father] should have been doing," she also testified that, as of the time of her April 2018 affidavit, there had been no issues with Father's home, which had been his biggest issue.

- 15 -

evidence, we conclude that the trial court erred in finding that substantial noncompliance had been independently established on both parents with regard to "the action step requiring anger management and parenting classes."

In connection with our conclusion on this matter, we find it appropriate to briefly comment on an argument made by the Department in its appellate brief. Therein, the Department rightfully acknowledges that the parents completed anger management classes. However, the Department also is quick to point out that the parents' completion of these classes did not occur until after the termination petition had been filed. Although the evidence supports that particular assertion, we are not persuaded that the Department's intended argument—that the parents' efforts were "too little, too late"—should have any force here.

In many cases, such a timing argument is not wholly misplaced. As we have explained previously, "[the] 'too little, too late' concept is often used to describe parents who, despite having an abundance of time and resources, wait until shortly before their termination hearing and then hurriedly try to comply with the obligations in their permanency plans." *In re M.J.M., Jr.*, No. M2004-02377-COA-R3-PT, 2005 WL 873302, at *10 (Tenn. Ct. App. Apr. 14, 2005) (citations omitted). As Justice Koch cautioned while serving on this Court, however, "the courts should not permit the Department to use it as a convenient way to circumvent its obligation to continue to provide reasonable support to a parent during the permanency plan's rehabilitation period." *Id.*

In this case, the "too little, too late" doctrine, as it relates to the parents' completion of anger management classes, is of questionable application at best. We say that in light of our observation of when the anger management requirement was added as a parental responsibility and what was communicated to the parents about it on the plan. As the trial court itself notes, the anger management requirement was added in the second family permanency plan, which was ratified less than a month before the termination petition was filed, on May 17, 2017. Given this close proximity in time and the fact that the permanency plan's achievement date for the newly-added anger management requirement extended into the 2018 year, it is not dispositive or even exceedingly significant to say that the parents had not completed anger management by the time that the termination petition was filed in June 2017. Moreover, as noted previously, when Ms. Raines was asked at trial regarding when the parents completed anger management, she replied as follows: "Oh, my gosh. That's been months and months ago."

Although we are compelled to reverse this ground for termination as it applies to Father in light of the above discussion, we find no occasion to disturb the trial court's finding of substantial noncompliance as to Mother in light of her widespread noncompliance with the various permanency plan requirements regarding her drug use. Although Mother's brief on appeal asserts that she did substantially comply with the

- 16 -

permanency plan requirements, specifically arguing that she had completed the "majority" of her requirements, the law is clear that gauging compliance under this ground for termination is not a rote mathematical exercise. Indeed, "[d]etermining whether a parent has substantially complied with a permanency plan involves more than merely counting up the tasks in the plan to determine whether a certain number have been completed." *In re Carrington H.*, 483 S.W.3d at 537 (citation omitted). As we have already noted, the significance of the noncompliance "should be measured by both the degree of noncompliance and the weight assigned" to a particular requirement. *In re Valentine*, 79 S.W.3d at 548.

The record is clear that achieving sobriety for Mother was at the forefront of the significant issues facing her in this case, as she had admitted to using drugs attendant to the children's entry into the Department's custody. Quite reasonably, the permanency plans included multiple requirements for Mother to follow in order to address her drug usage. Mother was, for instance, required to follow all recommendations from her alcohol and drug assessment and pass all random drug screens and pill counts. Based on the evidence presented at trial, Mother's noncompliance with these significant requirements was widespread. According to Ms. Dillon, Mother tested positive for multiple drugs on December 9, 2016, refused a drug screen on January 13, 2017, and tested positive for several drugs again on January 19, 2017. According to Ms. Raines, who took over the case for the Department after Ms. Dillon, she could not recall Mother ever passing a drug screen until after the termination petition had been filed. The depth of Mother's drug problems was also widely apparent. Ms. Dillon had suspected Mother was under the influence in several of her visitations, and according to Ms. Combs, who had witnessed drug paraphernalia upon one visit to the home, Mother openly admitted to going on meth binges. Despite the serious nature of these circumstances, Mother failed to complete the in-patient treatment recommended from her drug assessment. Although she had checked into an in-patient treatment center on one occasion, Mother stayed less than twelve hours.

Although it is true that Mother passed some drug screens administered in this matter, those results occurred only after the termination petition had been filed, and even then, Mother failed a drug screen in November 2017 and subsequently failed to make it for another drug screen at a later date. Concerning this latter drug screen for which Mother failed to appear, Ms. Raines testified as follows: "And I asked her to provide documentation of why she couldn't come from the police department or otherwise, and she has still not provided me any of that."

Mother's multiple failed drug screens, refusal to take certain drug screens, and failure to complete in-patient treatment, all of which is plainly established by the evidence, reflect a significant and sizeable level of noncompliance with the permanency plan requirements directed at Mother's drug abuse. Considering this and the fact that Mother's substance abuse concerns were at the forefront of importance in this case, we

reach the conclusion that Mother's substantial noncompliance with the permanency plan requirements has been established by clear and convincing evidence.

*Persistence of Conditions*

Tennessee Code Annotated section 36-1-113(g)(3) outlines the ground for termination commonly known as "persistence of conditions." It applies where the following elements are present:

(3) The child has been removed from the home of the parent or guardian by order of a court for a period of six (6) months and:

(A) The conditions that led to the child's removal or other conditions that in all reasonable probability would cause the child to be subjected to further abuse or neglect and that, therefore, prevent the child's safe return to the care of the parent or parents or the guardian or guardians, still persist;

(B) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent or parents or the guardian or guardians in the near future; and

(C) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home[.]

Tenn. Code Ann. § 36-1-113(g)(3) (2017).[6] "A finding on the ground of persistence of conditions is not appropriate unless DCS presents clear and convincing evidence to establish each statutory element." *In re B.A.C.*, 317 S.W.3d 718, 725 (Tenn. Ct. App. 2009) (citation omitted). The purpose behind this ground "is to prevent the child's

---

[6] Although not applicable to this appeal, we note that the statute has recently been amended:

This statute was amended effective July 1, 2018, expanding its reach. *See* Tenn. Pub. Ch. 875, § 2. As amended, the persistence of conditions ground applies to situations in which the child "has been removed from the home or the physical or legal custody of a parent or guardian for a period of six (6) months by a court order entered at any stage of proceedings in which a petition has been filed in the juvenile court alleging that a child is a dependent and neglected child." Tenn. Code Ann. § 36-1-113(g)(3)(A). Because this change is substantive rather than procedural or remedial, the amended statute will not be applied retroactively to this case.

*In re Billy C.*, No. M2018-00463-COA-R3-PT, 2018 WL 5751991, at *10 n.6 (Tenn. Ct. App. Nov. 1, 2018).

lingering in the uncertain status of foster child if a parent cannot within a reasonable time demonstrate an ability to provide a safe and caring environment for the child." *In re D.C.C.*, No. M2007-01094-COA-R3-PT, 2008 WL 588535, at *9 (Tenn. Ct. App. Mar. 3, 2008).

In this case, the trial court's specific findings with respect to this ground for termination were in their entirety as follows:

> The evidence is clear and convincing that the drug abuse by [Mother] has not been resolved and the condition of drug abuse has persisted since the time of removal in October 2016 to the date of trial in May 2018.
>
> [Father] continues to have communication issues and conflict resolution issues with [Mother] such that it does not appear that the children can have a safe, stable and permanent home with their parents.

As should be evident, these findings are not responsive to each of the statutory elements regarding this ground for termination. By way of illustration, although the trial court found that Mother's drug abuse persisted to the date of trial, it made no specific finding regarding the likelihood that such a concern could be remedied at an early date so that the children could be returned to Mother in the near future.[7]

The absence of appropriate findings supporting this ground for termination is not a trivial concern. With respect to termination cases, the trial court is specifically directed by statute to "enter an order that makes specific findings of fact and conclusions of law." Tenn. Code Ann. § 36-1-113(k). Because the trial court did not make specific findings regarding each of the elements applicable to the persistence of conditions ground, we are compelled to vacate the termination order with respect to this ground for termination as to both parents and, as to Father, remand[8] for the preparation of appropriate findings of fact and conclusions of law as required by statute. *See State v. C.H.K.*, 154 S.W.3d 586, 591 (Tenn. Ct. App. 2004) (vacating ground of abandonment finding under Tennessee Code Annotated section 36-1-102(1)(A)(iv) and remanding for findings when the trial court's order failed "to set forth any findings which show either that C.H.K. was incarcerated on July 18, 2002, the date D.C.S. filed its petition instituting termination proceedings, or that she was incarcerated during all or part of the four months immediately preceding that date"). Further findings as to Mother on this ground for termination are unnecessary

---

[7] Likewise, there does not appear to be a specific finding regarding the likelihood that Father's conflict resolution issues could be remedied at an early date.

[8] Although this Court has sometimes found a remand to be unnecessary in cases of insufficient findings when another ground for termination has been established, we have concluded that there are no grounds established against Father in this case at the present time.

given our ultimate disposition herein, which includes our affirmance of the termination of her parental rights.

*Failure to Manifest an Ability and Willingness to Personally Assume Custody or Financial Responsibility of the Children*

The last ground for termination relied upon by the trial court is codified at Tennessee Code Annotated section 36-1-113(g)(14). That statute provides that a parent's rights may be terminated when he or she

> [h]as failed to manifest, by act or omission, an ability and willingness to personally assume legal and physical custody or financial responsibility of the child, and placing the child in the person's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child.

Tenn. Code Ann. § 36-1-113(g)(14). This ground for termination, which is a relatively new addition to the Tennessee Code, requires the Department to establish two elements by clear and convincing proof. *In re Maya R.*, No. E2017-01634-COA-R3-PT, 2018 WL 1629930, at *7 (Tenn. Ct. App. Apr. 4, 2018) (citation omitted). The Department must first "prove that [the parent] failed to manifest 'an ability and willingness to personally assume legal and physical custody or financial responsibility of the child[ren].'" *Id.* (quoting Tenn. Code Ann. § 36-1-113(g)(14)). Second, the Department "must . . . prove that placing the children in [the parent's] 'legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the chil[ren].'" *Id.* (quoting Tenn. Code Ann. § 36-1-113(g)(14)).

In our opinion, the first prong of this ground "requires that the petitioner prove that a parent has failed to meet the requirement of manifesting both a willingness and an ability to assume legal and physical custody of the child or has failed to meet the requirement of manifesting both a willingness and an ability to assume financial responsibility of the child." *In re Amynn K.*, No. E2017-01866-COA-R3-PT, 2018 WL 3058280, at *14 (Tenn. Ct. App. June 20, 2018). In other words, consistent with the discussion in the *In re Amynn K.* decision, we do not view a parent's demonstration of "willingness" as fatal to this ground when accompanied by a failure to manifest the requisite "ability." *But see In re Ayden S.*, No. M2017-01185-COA-R3-PT, 2018 WL 2447044, at *7 (Tenn. Ct. App. May 31, 2018) ("The proof at trial negated a required element of the statutory ground. The juvenile court found: 'In this case, these parents definitely want to assume legal and physical custody of the children and are willing to assume financial responsibility for the children.'").

In this case, the trial court held that both Mother's and Father's rights should be terminated under this ground, finding that "both parents have failed to manifest the ability

to parent pursuant to T.C.A. 36-1-113(g)(14)." Regarding Mother, the trial court stated that she had "failed to manifest the ability to parent by her continued drug use." With respect to Father, the court stated that he had "failed to resolve . . . communication and anger issues with [Mother]."

As with the persistence of conditions ground, the trial court failed to make sufficient findings of fact with respect to this ground for termination. Nowhere in its discussion, for instance, did the trial court make findings that placing the children in their respective parents' legal and physical custody would pose a risk of substantial harm to their physical or psychological welfare. Of course, establishing such a risk of substantial harm is required under the statute, as previously mentioned. Because the trial court failed to make proper findings as to each element concerning this ground for termination, we vacate the trial court's conclusion that this ground applies to both parents and, as to Father,[9] remand for the preparation of findings of fact and conclusions of law as required by statute.

*Best Interests*

When at least one ground for termination has been properly established against a parent, as it has here for Mother, we turn our focus to whether termination of the parent's parental rights is in the children's best interests. "Because not all parental conduct is irredeemable, Tennessee's termination of parental rights statutes recognize the possibility that terminating an unfit parent's parental rights is not always in the child's best interest." *In re Jacobe M.J.*, 434 S.W.3d 565, 573 (Tenn. Ct. App. 2013) (citation omitted), *perm. app. denied* (Tenn. Mar. 5, 2014). As such, "[w]hen at least one ground for termination of parental rights has been established, the petitioner must then prove, by clear and convincing evidence, that termination of the parent's rights is in the child's best interest." *Id.* at 572 (citing *White v. Moody*, 171 S.W.3d 187, 192 (Tenn. Ct. App. 2004)).

When conducting a best interests analysis, conflicts between the interests of the parent and child are to be resolved in "favor of the rights and best interest of the child." *Id.* at 573 (citing Tenn. Code Ann. § 36-1-101(d)). Importantly, the best interests analysis "must be viewed from the child's, rather than the parent's, perspective." *White v. Moody*, 171 S.W.3d 187, 194 (Tenn. Ct. App. 2004) (citations omitted). In Tennessee, the General Assembly has codified a list of nine non-exclusive factors that trial courts are to consider when conducting a best interests inquiry in termination of parental rights proceedings. These factors are as follows:

---

[9] Again, further findings as to Mother are unnecessary given our ultimate disposition herein with regard to the termination of her parental rights.

(1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;

(2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;

(3) Whether the parent or guardian has maintained regular visitation or other contact with the child;

(4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol, controlled substances or controlled substance analogues as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

Tenn. Code Ann. § 36-1-113(i). "Ascertaining a child's best interests does not call for a rote examination" of these factors, and "depending upon the circumstances of a particular child and a particular parent, the consideration of one factor may very well dictate the outcome of the analysis." *In re Audrey S.*, 182 S.W.3d at 878 (citing *Moody*, 171 S.W.3d at 194).

In this case, although the trial court noted that Mother had visited her children and maintained a relationship with them, it found that she had "not made an adjustment of circumstance, conduct or conditions as to make it safe and in the best interest of the children to be in [her] home." The trial court also found that Mother had "failed to effect a lasting adjustment for such a duration of time that it does not appear the needed adjustment is possible at this time." Clearly underpinning the trial court's findings was a concern for Mother's substance abuse problems. Indeed, the court specifically concluded that "the mother's continued drug use and absolute refusal to seek treatment to combat the drug abuse issue makes it in the best interest of the children that her rights be terminated."

The record is replete with testimony and exhibits supporting the trial court's concern about Mother's ability to stay drug-free, and the evidence clearly and convincingly supports its determination that terminating her parental rights is in the children's best interests. We have already detailed much of the evidence pertaining to Mother's drug problems earlier in this Opinion, including her failure to pass multiple drug screens, her failure to submit to and/or appear for drug screens, and her open admissions to going on drug binges. Moreover, as we have noted, although Mother did pass some drug screens *after* the termination petition was filed, she then failed a drug screen in the fall of 2017 and failed to make it for another drug screen at a later date. Further, Mother acknowledged that she had never completed in-patient drug rehabilitation as had been recommended from her drug assessment. It is particularly concerning that Mother never actively pursued or participated in such treatment, outside of the one brief episode discussed herein, given her extensive and problematic history with drugs. Her failure to adequately combat her drug issues threatens the children's ability to be raised in a safe environment. Although we certainly commend her professed commitment to sobriety at the time of trial, there is ample evidence in the record to suggest that achieving any long-term sobriety is a speculative proposition. Considering the entire record in this case and the totality of the circumstances, we conclude there is clear and convincing evidence to support the termination of Mother's parental rights. Because no ground for termination has been established against Father at this time, we do not address the trial court's best interests analysis as to the termination of his parental rights. Should the trial court on remand find sufficient grounds to support the termination of Father's parental rights, the trial court should then conduct an appropriate best interest analysis as to Father.

**CONCLUSION**

Although we affirm the trial court's determination that the substantial noncompliance ground for termination was properly established as to Mother, we reverse its determination that the substantial noncompliance ground for termination was established as to Father. We vacate the other grounds for termination relied upon by the trial court, affirm the trial court's determination that the termination of Mother's parental

rights is in the children's best interests, and remand the case for further proceedings as are necessary and consistent with this Opinion. Concerning the proceedings occurring on remand, we direct the trial court to promptly address these matters. *See* Tenn. Code Ann. § 36-1-124 (providing that contested termination proceedings shall be expedited).

_____

ARNOLD B. GOLDIN, JUDGE